IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

v.                                                        Criminal Action No.: 1:18-CR-58
                                                                          JUDGE KLEEH

**BRIAN GRIFFEY,**

      **Defendant.**

## REPORT AND RECOMMENDATION RECOMMENDING THE MOTION TO SUPPRESS BE DENIED

This matter is before the undersigned pursuant to a Referral Order entered by United States District Judge Thomas S. Kleeh entered on February 5, 2019. (ECF No. 28). This matter is now ripe for the undersigned to issue a Report and Recommendation to the District Judge. Accordingly, the undersigned hereby **RECOMMENDS** that the Defendant's Motion to Suppress be **DENIED**.

    **I.**      **BACKGROUND**

On November 6, 2018, Defendant Griffey was charged in a one count indictment for the Unlawful Possession of a Firearm and Ammunition in violation of 922(g)(1). The indictment alleges that on June 5, 2018, Defendant knowingly possessed a Remington Arms Company, INC., Pump-Action shotgun, model 870 Express, 12-gauge, and ammunition and was not permitted to possess said firearm due to having at least one previous felony conviction. (ECF No. 1).

a. **Motion to Suppress**

On February 1, 2019, Defendant, by and through counsel, Scott Radman, filed a Motion to Suppress (ECF No. 26) arguing that the "mundane activity of an individual removing a generator from the trunk of an automobile does not begin to rise to the 'objective standard' that must be applied by an officer when determining whether or not 'reasonable suspicion.'" exists. Defs. Mot. at 2.

b. **Government's Response**

On February 8, 2019, the Government filed its Response arguing that the encounter was consensual because there was no show of authority nor any submission to said authority in the events leading up to the June 5, 2018 traffic stop. Gov't Resp. at 2-3. Furthermore, the Government argued that if the initial encounter, and subsequent encounters, constituted an investigatory stop, there was reasonable suspicion to conduct the stop of Mr. Griffey's vehicle. Id.

c. **Testimony**

Sargent Chris Shingleton testified during the motion hearing regarding the incident that occurred on June 5, 2018. (Motion Hearing Recording, 2:33 p.m.[1]). Sgt. Shingleton testified that he is a Sargent with the Nutter Fort Police Department and has worked for Nutter Fort[2] Police Department for approximately nine years. (2:34). Officer testified that part of his duties was to patrol the area during his shift, but the number of times that an officer patrols the area varies depending on the shift. (2:36). Sgt. Shingleton testified that on June 5, 2018, towards the end of his shift, he began patrolling the area at approximately 11:15 p.m. (2:44). Sgt. Shingleton

---

[1] This citation will be shortened throughout.
[2] Nutter Fort is approximately 2 square miles. As of June 2018, there were six police officers employed by Nutter Fort. Day Shift requires only two officers to work, while the Afternoon and Night shifts have only one officer working.

testified that he drove down Illinois Avenue and would have continued down the road except having seen a white vehicle.[3] (2:46).

Sgt. Shingleton testified that, at approximately the 600 block of Illinois avenue,[4] he noticed a white vehicle parked in a drive way and a black man standing at the rear of the car with his trunk open. (2:46). Sgt. Shingleton testified that after seeing this man with the trunk open, he continued driving, turned left on to Bryan Street, turned left on to Indiana, turned left on to Jacob Street, and ended up back around at 600 Illinois Avenue. (2:49). Sgt. Shingleton testified that he noticed that the male was still at the rear of the white car at 600 Illinois Avenue. (2:49). Sgt. Shingleton testified that he made a left turn and traveled down Illinois Avenue. (2:51). He testified that he "made the same loop" as he did before (left on Bryan Street, left on to Indiana Street, left on Jacob Street, and back around to Illinois Avenue). (2:52).

Upon returning to 600 Illinois Avenue, the white car and the male were gone. (2:54). Sgt. Shingleton testified that from there he continued patrolling. (2:54). He testified that he turned right and traveled down Illinois Avenue, turned right on to White Street, turned right on to Indiana Avenue and drove back up towards the residential neighborhood. Sgt. Shingleton testified that he turned left on to Washington Street and then turned right onto Ohio Avenue. Sgt. Shingleton testified that he noticed the white car was traveling away from the 600 Illinois residence and down Jacob Street. While Sgt. Shingleton was stopped at the stop sign on Ohio Avenue at the cross-street of Jacob Street, he saw the white car driving towards him on Jacob Street, abruptly stop, put its turn signal on, and pulled into a parking lot/driveway that was located before the Jacob Street-Ohio Avenue four way stop, pictured in Government's exhibit 3. Sgt. Shingleton turned right on Jacob Street and drove past the vehicle that had pulled off of

---

[3] The Government introduced Exhibits 1 through 9, which include google images of the area (Exs. 1-8) as well as a google map of the Town of Nutter Fort (Ex. 9). For reference of the roads, see Government Exhibit 9.
[4] See Red House pictured in Government's Exhibit 1.

Jacob Street. (2:57). Sgt. Shingleton stated that as he drove past the white vehicle, he saw the man get out of the vehicle with a blanket or rag and open the back of the car, but that was all Sgt. Shingleton was able to see. (2:57).

Sgt. Shingleton stated that he turned on to Indiana Avenue and at this point decided to turn around because 1) he had never seen the vehicle before, 2) the vehicle parked at another house that he did not recognize it to be a car that belonged there, 3) the car was parked at the 600 Illinois Avenue, 4) the Sargent did not recognize the car to belong at that residence, and 5) the car abruptly turned its turn signal on and parked. Sgt. Shingleton stated that he began backing up and noticed the vehicle was no longer on Jacobs Street where it had previously been. (3:00). Sgt. Shingleton then traveled down Indiana Avenue, turned right on Ohio Avenue, and returned back to the intersection that Sgt. Shingleton had previously seen the white car. (3:01). Sgt. Shingleton stated that he turned left on Jacob Street and at this time noticed the white car driving on Jacob Street and passing over the cross-street of Pennsylvania Avenue. (3:03).

At this point, Sgt. Shingleton stated that he followed the white car, but he did not have his lights or sirens on. (3:04). Sgt. Shingleton stated that upon reaching the cross-streets of Jacob Street and Maryland Avenue, he saw the white car pull in to an alley (otherwise known as Lewis Dodson Road). See Gov't Exhibit 7. At this point, Sgt. Shingleton identified the vehicle as a white Cadillac. (3:06). Sgt. Shingleton drove towards the vehicle and saw the man, that he had seen previously at the 600 Illinois Avenue residence, start walking towards a house. (3:06). Sgt. Shingleton parked and exited his vehicle and asked the individual what he was doing here. The individual stated that he was visiting his girlfriend who lived there (referring to the house that he was walking towards). Sgt. Shingleton stated that he knew a married couple had lived in the

4

house because he had had previously had interactions with the couple that lived there. (3:07). Sgt. Shingleton stated that, at this point, the man's behavior was suspicious.

At this time, Sgt. Shingleton informed the individual that he was being formally stopped. (3:08). Sgt. Shingleton requested that the man provide Sgt. Shingleton with his driver's license, registration, and proof of insurance. (3:08). Sgt. Shingleton stated that the man told Sgt. Shingleton that his driver's license was suspended, but provided Sgt. Shingleton with the vehicle's registration. Sgt. Shingleton stated that the individual provided his name—Defendant Brian Keith Griffey. (3:08). The vehicle's registration was in the name Jamie [last name not provided], who Mr. Griffey identified as his girlfriend. (3:08). The address provided on the registration was not the residence that Mr. Griffey originally told the officer was his girlfriend's. (3:09). Sgt. Shingleton asked Mr. Griffey if the registration was his girlfriend's current address, to which Mr. Griffey responded that it was. Id.

Sgt. Shingleton also testified from his past experience with the 600 Illinois Avenue residence that there have been previous calls regarding suspected drug activity at that location, suspected thefts, and a physical altercation that occurred within proximity to that location. (2:50). Sgt. Shingleton then testified that he personally responded to the residence three to four times in the previously eight to ten months prior to the incident. (2:50).

During cross examination, Sgt. Shingleton stated that approximately six residences in the area (referring to Nutter Fort Township) were "on his radar" just like the 600 Illinois Avenue Residence. (3:12). Sgt. Shingleton stated that had the individual originally been at the house located immediately to the right of the 600 Illinois Avenue home, Sgt. Shingleton would have circled the blocked because given the time of night it would have been suspicious. (3:13). Sgt. Shingleton stated that in the event that he saw the original car at the 600 Illinois residence during

the day, he would have circled the block. (3:14). Sgt. Shingleton stated it does not matter who the person was, he would have circled the block if he did not recognize the vehicle at the residence. (3:16). Sgt. Shingleton stated that he parked his vehicle but did not block Mr. Griffey's vehicle. Upon exiting his vehicle, Sgt. Shingleton testified that his lights and sirens were not on. (4:11). After approaching Mr. Griffey, Sgt. Shingleton stated that he requested that Mr. Griffey return to his vehicle and asked for his identification. (4:11).[5]

During final arguments during this motion hearing, the Government reiterated their point that the encounter was consensual because there was no show of authority nor did Mr. Griffey submit to the show of authority. Sgt. Shingleton does not use his lights or sirens and follows Mr. Griffey's vehicle at a distance. Furthermore, Sgt. Shingleton did not block his vehicle in to the alley that Mr. Griffey initially pulled in to the alley. The Government further argues that Mr. Griffey exited his vehicle and walked away from his vehicle, signaling that Mr. Griffey did not submit to any authority.

The Government argued in the alternative stating that if the undersigned were to find that Mr. Griffey was seized prior to the point that Sgt. Shingleton advised Mr. Griffey he was stopped, there was reasonable articulable suspicion. Sgt. Shingleton stated that the time that the incident occurred, the "problem" house that the vehicle was located, the Sargent has never seen the car at the house before, the car abruptly turned in to a parking space upon seeing the officer, Mr. Griffey got out of the car to put a blanket or rag in the back seat, and he had been provided with false information by Mr. Griffey, and are all considerations that the Sargent constituted reasonable suspicion. (4:26).

Defense Counsel then narrowed his argument conceding that there was reasonable suspicion upon Sgt. Shingleton exiting his vehicle after Defendant Griffey parked his vehicle in

---
[5] The undersigned finds that the testimony provided by Sgt. Shingleton to be credible.

the alley/Lewis Dodson Road. (4:29). Defense Counsel reiterated that his main contention begins with the initial citing of the white vehicle in the driveway of 600 Illinois block. Defense Counsel argued that the fact that the officer "said that it was reasonable suspicion no matter what--where he was, day or night, man woman, young old" was concerning and insufficient to constitute reasonable suspicion.[6]

## II. ANALYSIS

The Fourth Amendment protects "[t]he right of the people to be secure in their persons ... against unreasonable . . . seizures." U.S. Const. Amend. IV. "Obviously not all personal intercourse between policemen and citizens involves 'seizures' of persons. Mere questioning does not constitute a seizure. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968). Police officers are able to approach individuals and ask questions without having seized said individual. Florida v. Bostick, 501 U.S. 429 (1991). If "a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual." Id. If an encounter is consensual, no reasonable suspicion is required. Id. Until an encounter "loses its consensual nature," Fourth Amendment scrutiny will not apply to any encounter.

To determine whether a police officer asserted a show of authority that implicates the Fourth Amendment, the court determines based on the *totality of the circumstances* whether a reasonable person would believe they were free to leave. United States v. Stover, 808 F.3d 991 (4th Cir. 2015) (emphasis added). Examples of a show of authority include, police sirens and lights; commanding an individual to halt; and blocking a person's car so they are unable to

---

[6] The undersigned reviewed the testimony and Sgt. Shingleton stated that he would have circled the block whether any of these conditions existed—not that reasonable suspicion existed to circle the block.

move. Id. Other factors considered include, how many officers were present; whether an officer is in uniform and armed; whether the officer's questioning is intimidating; or whether the individual is told that he is suspected of criminal activity. United States v. Gray, 883 F.2d 320, 383 (4th Cir. 1989).

Furthermore, for the seizure to have occurred based on a show of authority, "an individual must submit to [said] authority." Stover, 808 F.3d at 996. What constitutes submission is fact determinable based on what the person was doing prior to the show of authority. Id. ("[A] fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away." Id.). Once an individual submits to that show of authority, the Fourth Amendment is triggered and a seizure must be supported by either reasonable suspicion or probable cause. Id.

Based on the totality of the circumstances, the undersigned finds that the police encounter was consensual between Sgt. Shingleton and Defendant Griffey up until when the Sargent exited his vehicle and approached Mr. Griffey[7] for the foregoing reasons. The undersigned finds that there were four "encounters"[8] between the Mr. Griffey and Sgt. Shingleton within the entirety of the June 5, 2018 incident. The first encounter occurred when Sgt. Shingleton initially drove past the white vehicle for the first time. This was the first time Sgt. Shingleton saw the white Cadillac and Defendant Griffey. Defense Counsel argues that based on this first encounter, the four to five seconds that Sgt. Shingleton viewed the vehicle and Mr. Griffey, did not produce enough reasonable suspicion for Sgt. Shingleton to circle the block. Sgt. Shingleton circled the block a second time, again seeing the white vehicle and Mr. Griffey, still at the 600 Illinois Avenue

---

[7] Defense Counsel conceded that after Sgt. Shingleton exited his vehicle and began speaking with Defendant, Sgt. Shingleton had reasonable suspicion based on the misleading information being presented by Defendant Griffey to Sgt. Shingleton.
[8] The undersigned uses the term "encounter," although Sgt. Shingleton did not have contact with Mr. Griffey until the Fourth Encounter.

8

residence, which constituted the second encounter. The third encounter occurred when officer turned right on to Jacob Street and passed the vehicle after it "abruptly" turned in to a driveway located just off Jacob Street.[9] The Fourth and final Encounter occurred when Sgt. Shingleton parked his car and approached Defendant Griffey's vehicle.[10]

The first three encounters would only require a reasonable articulable suspicion determination if the individual was seized. An individual is only seized through a show of authority, with actual submission to that authority, or physical restraint. During the first and second encounter, Sgt. Shingleton drove passed the vehicle, did not stop, did not turn on his emergency lights and sirens, nor made any contact with Mr. Griffey. Moreover, Mr. Griffey did not submit to Sgt. Shingleton by changing what he was doing. Following the Second Encounter, Mr. Griffey got in to his vehicle and then drove away. Mr. Griffey even left his vehicle in an alleyway and walked away from the vehicle, immediately prior to the Fourth Encounter.

The officer simply driving by Mr. Griffey for a second or third time does not render that individual seized. Therefore, Sgt. Shingleton did not need reasonable articulable suspicion to "circle the block" as he did between the first and second encounters. Sgt. Shingleton did not need reasonable articulable suspicion to "circle the block" after the second encounter. Sgt. Shingleton did not need reasonable articulable suspicion to do a three-point turn following the third encounter, even though Mr. Griffey had then pulled away. Sgt. Shingleton also did not need reasonable articulable suspicion to follow Mr. Griffey between the third and fourth encounter.

---

[9] The undersigned is not reviewing the fourth encounter, which was the encounter that followed Mr. Griffey pulling the vehicle into the alley—Lewis Dodson Road—because Defense Counsel conceded that that stop was based in reasonable suspicion. Defense Counsel narrowed his contentions to the first three encounters, as delineated above. The undersigned finds it important to note that while the Fourth Encounter began as a consensual encounter—police vehicle not blocking Defendant, asking questions regarding what he was doing, and simply requesting his identification and registration—the Encounter became a seizure upon notification that Sgt. Shingleton was stopping Mr. Griffey.

[10] The undersigned finds that the Fourth Amendment was triggered during this encounter. Sgt. Shingleton ordered that Defendant return to his vehicle to which Defendant Griffey complied. During this stop, Sgt. Shingleton told Defendant Griffey that he was stopped. This encounter and reasonable suspicion is not challenged.

Sgt. Shingleton did, however, need reasonable articulable suspicion to seize Mr. Griffey during the Fourth Encounter.

The Government and the Defense Counsel agreed that reasonable articulable suspicion was present to initiate the stop and was sufficiently testified to by Sgt. Shingleton at the Motion Hearing. Accordingly, the undersigned **FINDS** that there was no seizure triggering the Fourth Amendment requirement of reasonable articulable suspicion up until the Fourth Encounter.

### III. RECOMMENDATION

Accordingly, the undersigned **RECOMMENDS** that the Defendant's Motion to Suppress be **DENIED**.

Any party may, **on or before Tuesday, February 26, 2019**,[11] file with the Clerk of Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Thomas S. Kleeh, United States District Judge. Failure to timely file objections to this Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon the Report and Recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 717 F.2d 91 (4th Cir. 1984).

The Clerk of Court is **DIRECTED** to provide a Copy of this Report and Recommendation to counsel of record, as provided in the Administrative Procedures for

---

[11] "Although parties are typically given fourteen days to respond to a Report and Recommendation, see 28 U.S.C. § 636(b)(1), this allowance is a maximum, not a minimum, time to respond, and the Court may require a response within a shorter period if exigencies of the calendar require. United States v. Barney, 568 F.2d 134, 136 (9th Cir.1978)." United States v. McDaniel, 1:16-CR-52 (ECF No. 32 at 14-15, at footnote). See also United States v. Cunningham, 2011 WL 4808176, n. 1 (N.D. W. Va., Oct. 6, 2011); United States v. Mason, 2011 WL 128566, n. 7 (N.D.W. Va. Jan. 7, 2011). In this case, the final pretrial conference is set before the Honorable District Judge Thomas S. Kleeh on March 5, 2019 and Jury Selection and Trial is set for March 12, 2019. The resulting calendar exigency thus warrants shortening the period with which to file objections to the Report and Recommendation and will be due by February 26, 2019.

Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Date: February 21, 2019

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE